# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**F.D. MITCHELL, J.A. FISCHER, M.K. JAMISON**
Appellate Military Judges

**UNITED STATES OF AMERICA**

v.

**NANCY L. CASTILLO**
**MACHINIST'S MATE FIREMAN (E-3), U.S. NAVY**

**NMCCA 201300280**
**SPECIAL COURT-MARTIAL**


**Sentence Adjudged:** 29 March 2013.
**Military Judge:** CAPT Andrew Henderson, JAGC, USN.
**Convening Authority:** Commanding Officer, USS RONALD REAGAN (CVN 76).
**Staff Judge Advocate's Recommendation:** LCDR G.W. Manz, JAGC, USN.
**For Appellant:** LT Carrie Theis, JAGC, USN.
**For Appellee:** Maj Paul Ervasti, USMC; Capt Matthew Harris, USMC.


**27 May 2014**


---------------------------------------------------------
## OPINION OF THE COURT
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

FISCHER, Judge:

A panel of members with enlisted representation, sitting as a special court-martial, convicted the appellant, contrary to her pleas, of unauthorized absence, violating a lawful general order by failing to report her arrest for drunk driving, making

false official statements, and larceny, in violation of Articles 86, 92, 107, and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 892, 907, and 921. The members sentenced the appellant to reduction to pay grade E-1, a fine of $12,120.00, and a bad-conduct discharge. Additionally, the members sentenced the appellant to be confined for twelve months if she failed to pay the fine. The convening authority approved only so much of the sentence as provided for reduction to pay grade E-1, a fine of $5,000.00, and a bad- conduct discharge, and, except for the punitive discharge, ordered the sentence executed.[1]

The appellant now alleges three assignments of error (AOE). The appellant first alleges that a requirement in Chief of Naval Operations Instruction (OPNAVINST) 3120.32C,[2] that Sailors must self-report to their commanding officer any civilian arrest or criminal charge, is superseded by superior regulatory authority and violates her right against self-incrimination. The appellant's second and third AOEs allege her convictions for unauthorized absence and larceny are factually and legally insufficient.

After careful consideration of the pleadings of the parties and the record of trial, we conclude that the findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

### Background

The appellant joined the U.S. Navy on 2 August 2006 and shortly thereafter reported to her first assignment aboard USS RONALD REAGAN (CVN 76). At the time the ship was home-ported at San Diego, California. While assigned to REAGAN, the appellant met KC and a few weeks later they married on 27 August 2007. KC testified that he married the appellant because he loved her and believed she loved him. However, KC was aware, based on the appellant's representations, that she would make more money if they married.[3] KC testified that following their marriage, he

---

[1] The convening authority expressly disapproved the remaining fine amount of $7,120.00 and the 12 months of contingent confinement.

[2] OPNAVINST 3120.32C (Ch. 7, 16 Jun 2011).

[3] During all periods at issue in this case, the appellant was a Machinist's Mate Fireman (E-3) and a single E-3 assigned to REAGAN was not entitled to receive Basic Allowance for Housing or Family Separation Allowance.

and the appellant shared a house in San Diego with another couple.  On 4 September 2007, the appellant updated her NAVPERS 1070/602 form (Page 2) and submitted her marriage certificate to the Personnel Division on the ship.  This transaction began the appellant's receipt of Basic Allowance for Housing (BAH) at the dependent rate.  It also enabled the appellant to receive Family Separation Allowance (FSA) when the ship deployed.  On this Page 2, the appellant listed the San Diego address she and KC shared with the other couple.

In the following weeks, KC quickly realized that his marriage to the appellant did not meet his expectations.  He testified that he and the appellant never consummated the marriage and did not sleep in the same bed.  Moreover, KC testified that shortly after they were married the appellant told him she wanted an open relationship and at this point KC moved into a separate room at the residence.  In early 2008, KC came home from work and the roommates told him that the appellant had left and would not be coming back.  They also told KC he needed to vacate the house by the end of the week.  KC moved out and within a few months returned to his hometown of Victorville, CA.  From 2008 through the time of trial, KC was employed and supported himself financially.  He testified that he never obtained a military dependent's identification card, never used the military healthcare system or any services offered to military dependents, never shared a joint bank account with the appellant, and never received financial support from the appellant.  He testified that the only time he saw the appellant after she moved out was when they went to a tax preparer in early 2008 to file a joint 2007 tax return.  KC testified that although he tried several times to call the appellant and left her voice mails, she did not answer or return his calls.  KC stated that he signed divorce papers in 2010, however the appellant refused to sign the papers and at the time of trial they were still legally married.

Over the next several years, the appellant updated her Page 2 three times and indicated she and KC resided at addresses in Lakeside, CA, El Cajon, CA, and on Lake Murray Boulevard in San Diego, CA.  KC never resided at any of the addresses listed on these updated Page 2s and the appellant never lived at or had a valid lease for the Lake Murray Boulevard address.

In January 2012, REAGAN executed a home-port change from San Diego, CA to Bremerton, WA.  During this time the ship underwent a records review to determine whether Sailors left dependents in San Diego and thus qualified to continue to

3

receive the San Diego BAH rate as opposed to the Bremerton rate. At this point, the appellant submitted a lease for the Lake Murray Boulevard address to her command to show that she qualified for the San Diego BAH rate. Her command became suspicious because the lease did not have the appellant's name on it. The command then initiated an investigation into the appellant's receipt of BAH which eventually led to the larceny and false official statement charges.

The basis for the lawful general order violation stems from the appellant's 4 February 2012 arrest in Kitsap County, WA for driving under the influence of alcohol (DUI). Her command became aware of her arrest for DUI in August of 2012 when one of her supervisors was at the Kitsap County Courthouse with another Sailor and saw the appellant's name on the court docket for a DUI hearing. The supervisor informed the chain of command of the appellant's arrest and pending court case.

The basis for the unauthorized absence allegation stems from a period of emergency leave the appellant requested following her sister's death. After the appellant received a Red Cross message that her sister had died, she submitted a thirty-day leave request that was approved by the reactor duty officer, and on 1 August 2012 the appellant left REAGAN to begin her emergency leave. However, there was some confusion at the command regarding the duty officer's authority to approve that length of leave period. The reactor duty officer then called the appellant as she was on her way to the airport and told her to return to the ship and fill out a new leave chit for a lesser period, however the appellant continued to the airport and flew to Las Vegas, NV. Record at 439-40. The appellant returned to the ship on 4 September 2012. The end of the appellant's thirty-day emergency leave period was 1 September 2012, which was not a workday. The appellant acknowledged receiving multiple voice mail messages from her chain of command while she was in Las Vegas and knew from these messages that her command considered her in a UA status. The Government charged the appellant with unauthorized absence from 8 August 2012 through 4 September 2012. The members found the appellant guilty, through exceptions and substitutions, of unauthorized absence from 1-4 September 2012.

Additional facts necessary for the resolution of each AOE are developed below.

4

**Discussion**

*Reporting Requirements under OPNAVINST 3120.32C*

The appellant's first AOE raises the question of whether changes to the U.S. Navy Regulations and the Navy's Standard Organization and Regulations Manual, OPNAVINST 3120.32C, addressed constitutional and regulatory issues raised by this court in *United States v. Serianne*, 68 M.J.580 (N.M.Ct.Crim.App. 2009), *aff'd*, 69 M.J. 8 (C.A.A.F. 2010). Our court, sitting *en banc*, concluded an earlier OPNAVINST requiring an individual self-report any alcohol related arrest violated the Self Incrimination Clause of the Fifth Amendment.[4] *Id.* at 585. The following instructional language was at issue in *Serianne*:

> *All personnel* are responsible for their personal decisions relating to drug and alcohol use . . . . Members arrested for an alcohol-related offense under civil authority, which if punished under the UCMJ would result in punishment of confinement for 1 year or more, or a punitive discharge or dismissal from the Service (e.g., DUI/DWI), shall promptly notify their [Commanding Officer]. Failure to do so may constitute an offense punishable under Article 92, UCMJ.

*Id.* at 581.

We found the disclosures required by the regulation were compelled, testimonial, and incriminating, and therefore the regulation violated an accused's Fifth Amendment rights. *Id.* at 581-84. Additionally, we rejected the Government's assertion that OPNAVINST 5350.4C provided a regulatory exception to the Fifth Amendment. *Id.* at 585. The regulatory exception limits self-incrimination protection when the Government requires information for a legitimate administrative purpose. *Id.* at 584 (quoting *United States v. Swift*, 53 M.J. 439, 453 (C.A.A.F. 2000)) (additional citations omitted). We determined that an order concerning drunk driving, an activity "'very widely prohibited under both [military] and state law'", *id.* (quoting *Marchetti v. United States*, 390 U.S. 39, 44 (1968)) which authorizes commanders to take punitive action against those who fail to comply with it, was "decidedly punitive," not merely administrative, *id.*. Finally, we noted that OPNAVINST 5350.4C conflicted with a superior order, U.S. Navy Regulations Article

---

[4] The self-reporting requirement was mandated by OPNAVINST 5350.4C (Drug and Alcohol Abuse Prevention and Control). This self-reporting requirement was subsequently canceled.

1137, which required Sailors to report criminal offenses that come under their observation, except when they themselves are criminally involved in the offense. *Id.* 584-85; U.S. Navy Regulations, Art. 1137 (1990).

The Court of Appeals for the Armed Forces (CAAF) affirmed *Serianne* on the grounds that the order contained in OPNAVINST 5350.4C conflicted with Navy Regulation Article 1137. *Serianne*, 69 M.J. at 11 ("The lower court's description of Article 1137 as 'superior competent authority' is consistent with Article 0103 of the United States Navy Regulations, which states that the United States Navy Regulations serve as 'the principal regulatory document of the Department of the Navy,' and specifically states that '[o]ther directives issued within the Department of the Navy shall not conflict with, alter or amend any provision of Navy Regulations.'"). The CAAF concluded the subordinate OPNAV Instruction could not provide a legal basis for holding the appellant criminally liable. *Id.*[5]

After the CAAF's ruling, the Secretary of the Navy revised the Navy Regulations in a Naval Message entitled "Change to U.S. Navy Regulations in light of U.S. v. Serianne." *See* ALNAV 049/10 dtd 21 Jul 2010.[6] The revised Article 1137 continued to require persons in the Naval service to report all UCMJ offenses they observe, except when they themselves are already criminally involved in the enterprise. *Id.* It added a new requirement for service members to report anytime they received a civilian criminal conviction. *Id.* Additionally, the Secretary authorized the Chief of Naval Operations (CNO) and Commandant of the Marine Corps to "promulgate regulations or instructions that require servicemembers to report civilian arrests . . . if those regulations or instructions serve a regulatory or administrative purpose." *Id.*

Following the Secretary's authorization, the CNO issued NAVADMIN 373/11 on 08 December 2011.[7] This message, *inter alia,* amended OPNAVINST 3120.32C to mandate that Sailors self-report all civilian arrests or criminal charges. It states such "[d]isclosure is required to monitor and maintain the personnel readiness, welfare, safety, and deployability of the force." NAVADMIN 373/11, ¶ 4C. Under the revised instruction, Sailors

---

[5] Having resolved the case on the basis of the regulations, CAAF intentionally did not address the constitutional issue. 69 M.J. at 11.

[6] ALNAV messages are directed to all Navy units and the Marine Corps.

[7] NAVADMINs are Navy specific administrative messages.

6

must report the "date of arrest/criminal charges, the arresting/charging authority, and the offense for which they were arrested/charged[,]" but "[n]o person is under a duty to disclose any of the underlying facts concerning the basis for their arrest or criminal charges."  *Id*.  Furthermore, it authorized commanders to impose disciplinary action for Sailors who fail to self-report an arrest or criminal charges.  *Id*. at ¶ 6B.  Finally, the CNO in effect granted testimonial immunity for such self-reports stating, "commanders shall not impose disciplinary action for the underlying offense unless such action is based solely on evidence derived independently of the self-report."  *Id*. at ¶ 6A.

At trial, the defense challenged the constitutionality of the self-reporting requirement arguing that, despite the regulatory and instructional revisions, the self-reporting requirement still compelled a testimonial and incriminating statement, and therefore it violated the accused's Fifth Amendment right against self-incrimination.  Appellate Exhibit II.  Additionally, the trial defense counsel argued the regulatory exception to the Fifth Amendment developed in *California v. Byers*, 402 U.S. 424 (1971), did not apply to the revised OPNAVINST 3120.32C.  AE II at 9.  The military judge denied the defense motion to dismiss finding that:

> [P]aragraph 6 of NAVADMIN 373/11 imposes clear regulatory restrictions on commanders, removing the real danger of legal detriment.  As such, the compelled, testimonial act of providing the required information pertaining to the civilian arrest/charge is not incriminating.

AE XIX at 5 (footnote omitted).

Additionally, the military judge concluded:

> These clear restrictions on the use of the arrest/charge information distinguish the facts at bar from *Serianne* and further serve to evince the order's legitimate administrative purpose by segregating the required information from the criminal justice arena.

*Id*.

In sum, the military judge found the use restriction provision contained in NAVADMIN 373/11 made any required disclosure not incriminating and the self-reporting

7

requirement from OPNAVINST 3120.32C, as amended by NAVADMIN 373/11, was promulgated for a legitimate administrative purpose.  We agree.

This court reviews questions of the constitutionality and interpretation of instructions *de novo*.  *Serianne*, 69 M.J. at 10 (citing *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000)).  The Fifth Amendment to the U.S. Constitution guarantees that one not be "compelled in any criminal case to be a witness against [oneself]."  *Serianne*, 68 M.J. at 581 (quoting U.S. Constitution, Amendment V).  Furthermore, the UCMJ asserts that "no person subject to this chapter may compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him."  Art. 31(a), UCMJ.

To qualify for the Fifth Amendment privilege a communication must be compelled, testimonial, and incriminating.  *Serianne*, 68 M.J. at 581.  Paragraph 510.6 of OPNAVINST 3120.32C, as amended by NAVADMIN 373/11, clearly compels Sailors to self-report any civilian arrest and/or criminal charge.  For a communication to be testimonial it must be one that "'explicitly or implicitly relate[s] a factual assertion or disclose[s] information.'"  *Id.* at 581-82 (quoting *Doe v. United States*, 487 U.S. 201, 210 (1988)).  Although the revised instruction does not dictate a self-reporting method, "'[t]here are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts.  The vast majority of statements thus will be testimonial . . . ."  *Serianne*, 68 M.J. at 582 (quoting *Doe*, 487 U.S. at 213).  We find that the requirement of OPNAVINST 3120.32C, as modified by NAVADMIN 373/11, for Sailors to disclose to their command the "date of arrest/criminal charges, the arresting/charging authority, and the offense for which they were arrested/charged" to be testimonial, as well as compelled.  NAVADMIN 373/11, ¶ 4(C).

For a compelled, testimonial statement to be incriminating, the detriment to the individual who made the statement must be "'real and appreciable' and 'not a danger of an imaginary and unsubstantial character.'"  *Serianne*, 68 M.J. at 582 (quoting *Brown v. Walker*, 161 U.S. 591, 599 (1896)).  Incriminating statements are not only those that would support a conviction in and of themselves, but also "'those which would furnish a link the chain of evidence needed to prosecute [an individual] for a federal crime.'"  *Id*. (quoting *Hoffman v. United States*, 341 U.S. 479 (1951) (footnote omitted).  This case differs from *Serianne* because the regulation at issue expressly prohibits

8

commanders from imposing disciplinary action based on the self-report, whereas in *Serianne* we determined the relevant regulation was "decidedly punitive" and placed great emphasis on the role of commanders in disciplining service members involved in alcohol related misconduct. *Id.* at 584.

The appellant argues the self-reporting requirement of the revised OPNAVINST 3120.32C elicits incriminating information because the use restriction contained in the revision is of no effect or at most is "vague and qualified." Appellant's Brief of 20 Nov 2013 at 15-16 and 27. The appellant maintains that the provision in NAVADMIN 373/11 stating that "[n]o person subject to the [UCMJ] may question a person self-reporting an arrest/criminal charges . . . unless they first advise the person of their rights under UCMJ Article 31(b)" contradicts the use restriction provision, because it suggests information can be obtained from and used against the individual self-reporting if an Article 31(b) advisement is given. "The very existence of this questioning authorization calls into question whether the guidance actually offers immunity from prosecution." *Id.* at 16. Additionally, the appellant argues that even if there is some level of immunity, it "is only offered to those who report before the command finds out." *Id.* at 16 and 27.

The appellant's arguments are unpersuasive. We find nothing ambiguous in the CNO's directive prohibiting commanders from imposing discipline for the underlying offense of a self-reported civilian arrest or criminal charge, unless the disciplinary action is based solely on evidence derived independently of the self-report. While the imposition of discipline in such a circumstance may routinely raise the question of whether the evidence was obtained independent of the self-report, this is not a unique legal concept. Similar determinations must be made when the Government grants "testimonial" or "use" immunity and then later moves to prosecute the immunized witness. *See Kastigar v. United States*, 406 U.S. 441 (1972); *United State v. Vela,* 71 M.J. 283 (C.A.A.F. 2012); *United State v. Allen,* 59 M.J. 478 (C.A.A.F. 2004); *United State v. Mapes,* 59 M.J. 60, (C.A.A.F. 2003); *United State v. Youngman,* 48 M.J. 123, (C.A.A.F. 1998); *United State v. McGeeney,* 44 M.J. 418 (C.A.A.F. 1996). Such a circumstance does not run afoul of the Fifth Amendment's Self Incrimination Clause because the Self Incrimination Clause's "sole concern is to afford protection against being 'forced to give testimony leading to the infliction of 'penalties affixed to ... criminal acts.' Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom affords this

protection." *Kastigar,* 406 U.S. at 453 (internal citations omitted).

The Article 31(b) rights advisement language in the revision to OPNAVINST 3120.32C is clearly separate and distinct from the use restriction provision in paragraph 6 of NAVADMIN 373/11.[8]  Thus, we see no basis to conclude that such language impacts the use restriction in any fashion.  Similarly, when the command discovers one of its Sailors has been arrested and/or criminally charged prior to the Sailor self-reporting the arrest or charge, the Government is not relieved of its responsibility to show any evidence used when disciplining the Sailor for the underlying offense was obtained independently of the self-report.

As the military judge correctly determined, the use restriction in NAVADMIN 373/11, paragraph 6A, removed any real and appreciable danger of legal detriment for a self-reported arrest or criminal charge.  Thus, we conclude the compelled, testimonial statement required by the regulation is not incriminating.  Reaching this conclusion alleviates our need to determine if the revised instruction provides a regulatory exception to the Fifth Amendment.  However, the Secretary of the Navy's authorization to the CNO to promulgate regulations requiring servicemembers to report civilian arrests or filing of criminal charges is contingent on the regulation serving a regulatory or administrative purpose.  *See* ALNAV 049/10. Therefore, we must examine the revised regulation to insure its compliance with superior regulatory authority.

The stated purpose of OPNAVINST 3120.32C, paragraph 510.6, is to "monitor and maintain the personnel readiness, welfare, safety, and deployability of the force."  On its face the revised OPNAVINST 3120.32C appears to be administrative and in compliance with the Article 1137 of Navy Regulations.  There is an obvious and compelling need for commanders to be aware of their Sailors' pending civilian criminal cases due to potential impacts on the Sailor's deployability and in turn the effect on command readiness.  Moreover, pending criminal charges may have an impact on a Sailor's fitness to continue in or be assigned certain duties and responsibilities.  Finally, the limits placed on taking disciplinary action for the underlying offense of a

---

[8] We decline to speculate on the reason for including the rights advisement language in the revised instruction.  However, we do note it is preceded by the following statement, "[d]isclosure of arrest/criminal charges is not an admission of guilt and may not be used as such, nor is it intended to elicit an admission from the person self-reporting."  NAVADMIN 373/11 ¶4(C).

self-reported criminal arrest or charge reinforces the administrative nature of the regulation.

The appellant, however, argues the revised instruction is punitive in effect under a seven-factor test set forth by the Supreme Court in *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168–70 (1963).  The Court applied the factors to determine whether an act of Congress was punitive or regulatory.  The CAAF applied the *Mendoza-Martinez* test to determine the nature of a Department of Defense regulation in *United States v. Fischer*, 61 M.J. 415, 420 (C.A.A.F. 2005).[9]  The *Mendoza-Martinez* test includes the following factors:  (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation promotes retribution and deterrence – the traditional aims of punishment; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.  *Fischer*, 61 M.J. at 420, (citing *Mendoza-Martinez*, 372 U.S. at 168-69).  Assuming arguendo that the *Mendoza-Martinez* test applies in this circumstance, we disagree with the appellant's assertion that it casts the revised instruction as punitive.

*i.  Affirmative Disability or Restraint*

OPNAVINST 3120.32C imposes a duty on Sailors to self-report any civilian arrest or pending charge.  It does not create an affirmative disability or restraint.  In fact, it expressly prohibits the imposition of disciplinary action based upon the self-report.  The appellant's argument that a self-report may lead to administrative separation or poor evaluations is speculative and, in any event, such actions are not dictated by the instruction at issue and therefore do not qualify as an affirmative disability or restraint under this prong.

*ii. Historic Perspective*

Compulsory disclosure of a criminal arrest or charge is not a traditional punishment, nor does the appellant so contend.

---

[9] In *Fischer* the CAAF assumed without deciding that the *Mendoza-Martinez* factors applied in reviewing alleged violations of Article 13, UCMJ.  At issue in *Fischer* was whether Department of Defense pay regulations that terminated the accused's pay while he served pretrial confinement following his expiration of active service.

11

The appellant asserts however, that the loss of the opportunity to serve the government has historically been regarded as punishment for the purpose of this test.  *United States v. Lovett*, 328 U.S. 303, 316 (1946).  *Lovett* differs significantly from the case at bar.  In *Lovett,* the Supreme Court considered a statute that singled out federal employees for "subversive activities" and prohibited such employees from ever again being compensated for government employment.  The Court found this constituted severe punishment.  *Lovett*, 328 U.S. at 314-16.

As discussed *supra*, there is no evidence in the record to support the proposition that administrative separation inevitably flows from a self-report required by the instruction. Moreover, there is no evidence in the record and we will not speculate, that an individual administratively separated from the U.S. Navy would be barred from future federal service.

### iii. Scienter

In the context of a criminal statute, scienter exists "[w]here the lawmakers have incorporated into the act a word or words descriptive of the crime which imply the necessity of 'a mind at fault before there can be a crime,' criminal intent becomes an essential fact in establishing the guilt of a person accused of its violation."  *United States v. Thomas* 65 M.J. 132, 134 (C.A.A.F. 2007) (quoing *Masters v. United States,* 42 App. D.C. 350, 356 (D.C. Cir. 1914)).  Consciousness of guilt does not trigger the self-reporting requirement, so scienter is a non-factor under the regulation.  *Fisher*, 61 M.J. at 420-21.

### iv. Retribution and Deterrence

The instruction is not aimed at retribution or deterrence for the underlying criminal activity of individuals who self-report an arrest or charge, but rather to "monitor and maintain the personnel readiness, welfare, safety, and deployability of the force."  OPNAVINST 3120.32C, ¶ 510.6.  Commanders are expressly prohibited from pursuing disciplinary action based solely on information derived from a self-report.  NAVADMIN 373/11.

### v. Application to Criminal Behavior

The fifth factor is whether OPNAVINST 3120.32C is invoked as a result of behavior that is already a crime.  *Fischer*, 61 M.J. at 421 (citing *Mendoza-Martinez*, 372 U.S. at 168).  This factor does weigh in favor of the appellant as the instruction

to self-report is triggered if a servicemember is arrested or charged with a crime.

### vi. Alternative Purpose

The purpose of the instruction is to "monitor and maintain the personnel readiness, welfare, safety and deployability of the force." OPNAVINST 3120.32C, ¶ 510.6. Personnel readiness and the welfare, safety and deployability of the force are clearly integral to the operation of the U.S. Navy. The appellant's contention that her command's readiness was not impacted by her failure to self-report her civilian arrest for DUI does not invalidate the instruction. In the appellant's specific case, she was attached to REAGAN while the ship executed a homeport change. One can certainly envision where the appellant's pending DUI offense could have directly impacted her personal readiness and/or her deployability.

### vii. Excessiveness

The final factor is whether OPNAVINST 3120.32C is excessive in relation to the alternative purpose assigned to it. *Fischer*, 61 M.J. at 421 (citing *Mendoza-Martinez*, 372 U.S. at 169). OPNAVINST 3120.32C does not require the individual to divulge any of the underlying facts associated with the arrest or criminal charge. We find that the information required to be provided in as self-report is not excessive for the instruction's stated purpose. In fact, we find that the self-reporting requirement is a minimally restrictive means to meet the Navy's goal, while protecting a service member's statutory and constitutional rights.

In sum, the majority of the *Mendoza-Martinez* factors clearly weigh in favor of finding the self-reporting requirement of the revised OPNAVINST 3120.32C regulatory in nature. Based on this analysis, we find the revised OPNAVINST 3120.32C was promulgated for a regulatory or administrative purpose and thus complies with U.S. Navy Regulations Article 1137 as amended by ALNAV 049/10.

### Factual and Legal Sufficiency

In her second and third AOEs, the appellant argues that the evidence is legally and factually insufficient to convict her of unauthorized absence (UA) and larceny. The test for legal sufficiency is whether any rational trier of fact could have found that the evidence met the essential elements of the

charged offenses, viewing the evidence in the light most favorable to the government. *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987). The test for factual sufficiency is whether we ourselves are convinced of the appellant's guilt beyond a reasonable doubt, allowing for the fact that we did not personally observe the witnesses. *Id.* at 325.

Proof beyond a reasonable doubt does not mean that the evidence must be free of conflict. *United States v. Goode*, 54 M.J. 836, 841 (N.M.Ct.Crim.App. 2001). The factfinders may believe one part of a witness' testimony and disbelieve another. *Id.* When weighing the credibility of a witness, this court, like a fact-finder at trial, examines whether discrepancies in witness testimony resulted from an innocent mistake such as a lapse of memory or a deliberate lie. *Id.* at 844.

### i. Unauthorized Absence

The appellant contends that her conviction for UA is legally and factually insufficient because she was acquitted of an underlying period of alleged UA during which she was granted leave. The appellant was charged with UA from 8 August until 4 September 2012, but was found guilty by exceptions and substitutions of the lesser UA period of 1-4 September 2012. The appellant contends that September 1st, 2nd and 3rd were not workdays and therefore, it negates the element that a "certain authority appointed a certain time and place of duty for [Fireman Castillo] during those days over the Labor Day weekend." Appellant Brief's at 29-30. We disagree.

The appellant testified that her requested leave ran through 31 August 2012, and that no one from her command granted her authority to be absent from 1 September until she returned to the ship on 4 September. Record at 561. Additionally, the appellant was aware REAGAN's quarterdeck was manned twenty-four hours a day. *Id.* at 562. The appellant acknowledged receiving multiple voice mail messages in August from members of her chain of command indicating that she was considered UA and urging her to contact them to straighten out the situation. *Id.* at 563-564. The appellant chose not to communicate with her chain of command to resolve her situation and elected to return to her command on 4 September 2012. *Id.* at 565. We disagree with the appellant's assertion that her UA conviction for 1-4 September 2012 was dependent on a finding that she was previously UA from 8 August through 1 September 2012. After reviewing the record, we find that a rational trier of fact could have found that the appellant had a duty to report to her command following the

14

expiration of her emergency leave and therefore the essential elements of unauthorized absence were met.  We are ourselves convinced beyond a reasonable doubt as to the appellant's guilt.

## ii. Larceny

At trial the Government provided alternate theories of proof for the larceny charge -- false pretense and wrongful withholding.  The appellant asserts the Government's theory of larceny by false pretense is legally deficient, because in its response to a trial defense motion to dismiss the charge, the Government stated the false pretense "arose from her [the appellant's] silence when she clearly knew that disbursing officials were continuing to pay BAH with dependents and FSA, which she knew she was not entitled to receive."[10]  AE XXXV at 7.  Under a false pretense theory of larceny, the pretense must be made through an affirmative step.

> With respect to obtaining property by false pretense, the false pretense may be made by means of any act, word, symbol or token. The pretense must be in fact false when made and when the property was obtained, and it must be knowingly false in the sense that it is made without a belief in its truth.  A false pretense is a false representation of past or existing fact.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) Part IV, ¶ 46(e). Although the Government indicated in pretrial motions that the false pretense was asserted through the accused's silence, it did not propose such a theory at trial.  The trial counsel detailed several affirmative steps the appellant took, such as submitting false Page 2s and lying to command members about her husband's location, to continue to receive BAH and FSA at the San Diego rate.  In discussing proposed instructions, the military judge noted that under a false pretense theory, the taking must include an affirmative act.  Record at 585.  We find there was sufficient evidence to support a theory of larceny by false pretense and the military judge properly instructed the members on the larceny theories raised by the evidence.  *See id*. at 593-96 and AE CI.

---

[10] The appellant does not challenge the Government's wrongful withholding theory for larceny.

To receive BAH at the dependent rate one must have a qualifying dependent and financially support that dependent. *United States v. Bulger*, 41 M.J. 194, 196 (C.M.A. 1994). During the charged time period, February 2009 through July 2012, the appellant received more than $84,000.00 in allowances based upon her marriage to KC. While the record is clear that KC and the appellant remained married during the relevant time, the issue in this case is one of support. The appellant contended at trial that she financially supported KC by providing him a portion of their 2007 tax refund and several thousand dollars during times they met following their physical separation in early 2008. Record at 516, 533-34. However, contrary to the appellant's assertions, KC maintained that he never received any financial support from the appellant and, in fact, had not seen the appellant for approximately five years before he testified at her court-martial. *Id.* at 221. Moreover, in February 2009, the appellant moved in with and began a romantic relationship in with another person who testified that the appellant indicated she was divorced. *Id.* at 250-51. The appellant affirmatively and knowingly provided false addresses for her husband that enabled her to maintain her BAH entitlement and when the ship executed a homeport change to Bremerton, WA, she provided a false lease in order to continue her entitlements at the San Diego rate. *Id.* at 552-53, 555-57. The record contains sufficient evidence for a rational fact finder to find the essential elements of larceny and we are convinced beyond a reasonable doubt as to the appellant's guilt. Therefore we find the appellant's conviction for larceny both legally and factually sufficient.

## Conclusion

The findings and the sentence as approved by the convening authority are affirmed.

Senior Judge MITCHELL and Judge JAMISON concur.


For the Court



R.H. TROIDL
Clerk of Court

16